# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **CERRON THOMAS HOOKS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **1:05CV1127** |
| | ) | |
| **R.C. LEE, Warden, Central Prison,** | ) | |
| **Raleigh, North Carolina,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE</u>

Petitioner Cerron Thomas Hooks, a North Carolina death row inmate, has filed in this court a habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his 2000 state court conviction and sentence for first-degree murder. The jury recommended a sentence of death and the trial court imposed that sentence. Petitioner seeks in this court a writ of habeas corpus discharging him from his confinement and restraint, and relieving him of his sentence of death. Petitioner was represented at trial by attorneys Lisa S. Costner and Christopher R. Clifton. He was represented on direct appeal by appointed counsel J. Clark Fischer. Petitioner is represented in this proceeding by attorneys Franklin E. Wells, Jr. and Jonathan L. Megerian. Respondent R.C. Lee of Central Prison ("the State") is represented by the North Carolina Attorney General.

## THE STATE COURT PROCEEDINGS

Petitioner Hooks was convicted of first-degree murder at the January 24, 2000 Criminal Session of the Superior Court of Forsyth County, North Carolina. Petitioner's conviction and sentence of death were affirmed by the Supreme Court of North Carolina on July 20, 2001. *See State v. Hooks*, 353 N.C. 629, 548 S.E.2d 501 (2001). On February 19, 2002, the United States Supreme Court denied certiorari review. *Hooks v. North Carolina*, 534 U.S. 1155 (2002).

On January 23, 2003, Petitioner filed a Motion for Appropriate Relief ("MAR"), North Carolina's procedural mechanism for state post-conviction review, in the Superior Court for Forsyth County. On June 2, 2003, the State filed its Response to the Motion for Appropriate Relief. No hearing was held. On June 3, 2005, Superior Court Judge L. Todd Burke entered an Order denying Petitioner's Motion for Appropriate Relief. On December 1, 2005, the Supreme Court of North Carolina denied Petitioner's request for certiorari review. On December 20, 2005, Petitioner filed his Petition for Writ of Habeas Corpus with this Court. Respondent timely filed its Answer to the Petition. The Petition is now before this Court for consideration. In a hearing held on February 22, 2007, the Court heard arguments from attorneys representing both the Petitioner and the State.

## THE CLAIMS OF THE HABEAS CORPUS PETITION

Petitioner Hooks presents the following eleven claims in his habeas petition:

I.      There exists new evidence which has a direct and material bearing on the defendant's guilt and his eligibility for the death penalty, and which

makes clear that the State presented witnesses' testimony in a materially false light.

II.     Trial counsel rendered ineffective assistance of counsel pursuant to the Sixth, Eighth, and Fourteenth Amendments by failing to present readily available evidence to use at the guilt-innocence phase of the defendant's capital trial, and by failing to investigate and discover evidence which would have negated the elements of premeditation and deliberation and served to impeach witnesses for the State.

III.    Trial counsel failed to adequately prepare Dr. Tyson for his testimony and to present that testimony in a manner so as to be most effective and credible at the sentencing hearing in Cerron Hooks' capital trial.

IV.     Trial counsel failed to advise the defendant of the existence of a possible defense of diminished capacity, and failed to get his approval before choosing not to present this evidence at the guilt phase of the capital trial, effectively waiving a defense to first-degree murder.

V.      The Superior Court lacked jurisdiction to try the defendant capitally because the indictment on which the defendant was arraigned failed to allege all elements of first-degree murder or any aggravating circumstance which would make him eligible for the death penalty.

VI.     The trial court committed prejudicial error by submitting as the sole aggravating factor that the murder was especially heinous, atrocious or cruel, when all the evidence showed that the defendant spontaneously shot the victim in the course of an alcohol-laden argument, that the victim did not beg for his life or lay helpless unable to prevent his impending death, and that defendant's conduct did not evince a depravity of mind beyond that normally present in a first-degree murder.

VII.    The trial court committed plain error by defining reasonable doubt in a manner that was legally incorrect and which unavoidably lowered the State's burden of proof.

VIII.   The trial court committed prejudicial error by refusing to submit the mitigating factor of N.C.G.S. 15A-2000(f)(2), as the defense presented more than sufficient evidence that the defendant committed the murder

-3-

under the influence of mental or emotional disturbance to require that
this crucial issue be placed before the jury.

IX.     The trial court erred by permitting the State to offer victim's impact
        evidence that exceeded the scope of permissible prosecution evidence
        under *Payne v. Tennessee*, 501 U.S. 808 (1991).

X.      The trial court erred by submitting the heinous, atrocious or cruel
        aggravating factor of N.C.G.S. 15A-2000(e)(9), as this factor is
        unconstitutionally vague and overbroad.

XI.     The death sentence imposed against the defendant was disproportionate
        as a matter of law, since juries do not consistently impose death
        sentences in cases in which the defendant acted with minimal
        premeditation and where the shooting occurred in the context of an
        alcohol-inflamed argument.

The State concedes in its Answer to the Petition that Petitioner Hooks has exhausted

his state court remedies with respect to all eleven claims.

## THE EVIDENCE PRESENTED AT TRIAL

The Supreme Court of North Carolina summarized the evidence presented at

Petitioner's trial in 2000 as follows:

The State's evidence tended to show that on 5 September 1998 the victim
[Michael Miller] invited friends to a pool party at the apartment complex
where the victim resided. Shortly after the party started, defendant went to the
pool area and joined the gathering. Defendant was drinking beer at the pool,
although witnesses testified that he did not appear to be intoxicated. Around
9:30 that night, the victim invited the guests at the pool back to his apartment
to continue the party.

Later that night, the victim's roommate saw defendant playing outside the
apartment with a .45-caliber "automatic" pistol equipped with a laser scope.
A short time later defendant returned to the apartment and began looking for
a shirt that he had taken off in the apartment earlier in the evening. The victim
told defendant that he had not seen the shirt and that he would return it to a

-4-

mutual friend should he find it later. Defendant then "got loud" and began searching the apartment for his shirt, eventually entering the victim's closed bedroom. The victim told defendant that defendant "can't disrespect his house" and asked defendant to leave. While defendant was walking towards the door to leave, he and the victim "had words" back and forth, culminating in defendant telling the victim just outside the front door, "you ain't going to disrespect me in front of them bitches."

As defendant was walking down the stairs outside the apartment, the victim followed defendant down to the ground level to make sure that he left. Defendant and the victim continued arguing face to face at the bottom of the stairs. Defendant stated that he was going to "f–k [the victim] up." The victim began backing away, and defendant pulled a .38 caliber handgun from his pocket and pointed it at the victim's face. The victim said, "Oh, you're going to shoot me now"; and after a "silent moment," defendant shot the victim four times.

The victim fell to the ground; and defendant began kicking him in the face and chest, pistol-whipping him, and taunting him by saying, "you thought I was playing, you thought I was playing." Defendant then fled the scene. The victim remained conscious and in obvious extreme pain for at least fifteen minutes after the shooting while a neighbor administered aid. Officers with the Winston-Salem Police Department apprehended defendant on 8 September 1998. At the time, defendant, with a fully loaded nine-millimeter Luger in his hand, was crouching behind a retainer wall at the top of a stairwell.

The medical examiner who autopsied the victim's body found four gunshot entry wounds: one in the face, which broke the victim's jaw and went through his tongue; one in the abdomen, which traveled through the victim's liver; one in the victim's left arm, which traveled completely through the arm; and one in the upper back, fragments of which lodged in the victim's neck and cheek. The victim died approximately twelve hours after the shooting as a result of the gunshot wounds.

*See State v. Hooks*, 353 N.C. at 631-32, 548 S.E.2d at 504.

## THE HABEAS CORPUS STANDARD OF REVIEW

### A.     Procedural Default

Federal courts generally are barred from reviewing habeas claims that were not reached on the merits in state court because of a petitioner's non-compliance with "independent and adequate" state procedural rules. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *McNeill v. Polk*, 476 F.3d 206 (4th Cir. 2007), *petition for cert. filed*, No. 07-5600 (Jul. 27, 2007). A state has an interest in its rules and procedures and in the finality of its judgments, which "would be undermined if the federal courts were too free to ignore procedural forfeitures in state court." *Reed v. Ross*, 468 U.S. 1, 10 (1984). A state procedural rule is considered "adequate if it is regularly or consistently applied by the state courts, and it is independent if it does not depend on a federal constitutional ruling." *McNeill*, 476 F.3d at 211 (citing *Johnson v. Mississippi*, 486 U.S. 578 (1988) and *Ake v. Oklahoma*, 470 U.S. 68 (1985)).

There are two exceptions to the procedural default bar. First, a habeas court may review an otherwise procedurally defaulted claim if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman*, 501 U.S. at 750; *see also McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000). To demonstrate "cause," a petitioner may make "'a showing that the factual or legal basis for a claim was not reasonably available to counsel." *McCarver*, 221 F.3d at 591 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). To establish "prejudice," a petitioner must

-6-

show "'not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 592 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Second, a habeas court may review an otherwise procedurally defaulted claim if the petitioner can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *see also McCarver*, 221 F.3d at 588. The "fundamental miscarriage of justice" exception applies only to a narrow class of cases involving "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey*, 499 U.S. at 494. Therefore, in order to establish a "fundamental miscarriage of justice," a petitioner must show actual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 346-47 (1992); *see also Smith v. Dixon*, 14 F.3d 956, 974 (4th Cir. 1994). In the context of a capital proceeding, a death-penalty petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." *Sawyer*, 505 U.S. at 336.

**B. Review on the Merits**

Review of a state court decision on the merits of a prisoner's habeas corpus claims is governed by the deferential standard of review set forth in 28 U.S.C. § 2254(d), part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). After concluding that both the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) must be given independent meaning, the United States Supreme Court articulated the following standard of review:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring).

A state court's decision must be substantially different from relevant Supreme Court precedent before relief may be granted under the "contrary to" clause. *Id.* at 405 (noting that the word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed"). Under the "unreasonable application" clause, "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410. Therefore, "a federal

-8-

habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000).

Section 2254 precludes *de novo* federal habeas corpus review of state court decisions on the merits of a petitioner's claim. *Bell,* 236 F.3d at 159-60 (overruling *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir. 1998)). Even a summary adjudication, wherein the state court fails to articulate any rationale for its decision, is considered an adjudication on the merits and should be accorded deference under § 2254(d)(1). *See id.* at 163. When faced with a state court decision that does not explicitly cite or apply federal law, the habeas court should conduct an "independent examination of the record and the clearly established Supreme Court law." *Id.* at 158. Nevertheless, the habeas court must still confine its review to whether the "result" of the state court decision "is legally or factually unreasonable." *Id.* at 163 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

Finally, AEDPA did not substantially alter the standard of review concerning state court factual determinations. Factual determinations made by a state court are afforded a presumption of correctness. 28 U.S.C. § 2254(e)(1). In order to rebut the presumption of correctness, a petitioner must present clear and convincing evidence. *Id.*

## DISCUSSION OF CLAIMS

## CLAIM I - New Evidence

Petitioner asserts that his conviction and sentence are illegal because of "new evidence which has a direct and material bearing on the defendant's guilt and his eligibility for the death penalty . . . ." (Pleading No. 3, Pet. at 11.) Specifically, Petitioner points to the post-trial affidavit of Lisa McRae, one of the trial witnesses who was at the party the night Mr. Miller was killed. Ms. McRae testified at the trial that she had not had any alcoholic beverages to drink on the day of the party and that Petitioner did not appear to be drunk. She also testified that Petitioner kicked Mr. Miller after he shot him.[1] In her post-trial affidavit, Ms. McRae contradicted her trial testimony, stating that she was drinking at the party and that Petitioner "appeared to be very intoxicated, although he was able to stand and walk." She described Petitioner's "state of intoxication" as "sloppy drunk." (*Id.*, Ex. 1, Lisa McRae Affidavit ("McRae Aff.") ¶ 6.) She also stated in her affidavit that "after [Petitioner] shot Mike, he put his foot in Mike's face; I cannot be certain whether he kicked him or not." (*Id.* ¶ 10.)

Petitioner argues that the inconsistency between Ms. McRae's pretrial statement and trial testimony and her post-trial affidavit entitles him to a new trial and sentencing hearing. He argues that because testimony about his level of intoxication directly bears on his ability

---

[1] Ms. McRae's trial testimony was consistent with her tape-recorded statement given to the police the day after the victim was shot. In her statement, Ms. McRae stated that she saw Petitioner kicking the victim in the face after the victim fell. She also stated that she heard Petitioner saying, "You thought I was playing; you thought I was playing." (State Answer to MAR, Ex. 7.)

-10-

to premeditate and deliberate, and thus be guilty of capital murder, this claim should be analyzed under the "actual innocence" model set forth in several United States Supreme Court cases. Additionally, Petitioner contends that Ms. McRae's testimony had a direct bearing on Petitioner's eligibility for the death penalty because she was one of only two witnesses who testified that Petitioner kicked the victim after he shot him. Petitioner claims that the affidavit of Ms. McRae constitutes "new evidence."

Newly discovered evidence is generally not itself a ground for habeas relief, except insofar as it supports review of an independent constitutional claim that is otherwise procedurally barred. As the Supreme Court made clear in *Schlup v. Delo*:

> [Petitioner's] claim of innocence does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his [other substantive claims]. [Petitioner's] claim of innocence is thus "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."

513 U.S. 298, 315 (1995) (citations omitted); *see also Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("'[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.'") (citation omitted). In the context of capital sentencing, "a viable gateway innocence claim demonstrates by clear and convincing evidence, that, but for the defaulted constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Buckner v. Polk*, 453 F.3d 195, 200 (4th Cir. 2006), *cert. denied*, ___ U.S. ___, 127 S. Ct. 1817 (2007).

Nevertheless, in exceptional cases, freestanding claims of actual innocence on the basis of new evidence may merit habeas relief, but "the threshold showing for such [a] right [must] necessarily be *extraordinarily high*." *Herrera*, 506 U.S. at 417 (emphasis added). To establish actual innocence of a conviction on habeas, a petitioner must show that "'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence' presented in his habeas petition." *Calderon v. Thompson*, 523 U.S. 538, 560 (1998) (citing *Schlup*, 513 U.S. at 324). The general federal standard for awarding a new trial on the basis of newly discovered evidence is similar. A new trial motion on the basis of newly discovered evidence "'should be granted only with great caution' and only upon a showing that the evidence *could not* with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence *would probably lead to an acquittal*." *United States v. Alessi*, 638 F.2d 466, 479 (2nd Cir. 1980)(emphasis added) (citation omitted); *see also United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001)(listing the five-part test to determine whether a new trial should be granted under Fed. R. Crim. P. 33 for newly discovered evidence, including a requirement that facts must be alleged from which the court may infer diligence on the part of the movant).

The evidence relied on by Petitioner, i.e., the post-trial affidavit of Lisa McRae, does not meet the stringent test for newly discovered evidence sufficient to entitle Petitioner to a new trial. *See Stockton v. Virginia*, 852 F.2d 740, 749 (4th Cir. 1988) (hearsay evidence of

-12-

recantation of critical prosecution testimony inadequate to raise constitutional issue where unaccompanied by any suggestion of prosecutorial misconduct or similar allegations). As an initial matter, the affidavit is not "newly discovered evidence" in the purest form of the phrase. If anything, the affidavit affects only Ms. McRae's credibility. It does not bring forward new evidence nor does it attack the credibility of any other witness. Moreover, the affidavit is not, in the Court's judgment, evidence which would likely bring about a different trial result. There was testimony from another witness, Sabrina Porter, who also testified that Petitioner kicked and taunted the victim after he shot him. There is no suggestion that the State put forward false or misleading testimony. In fact, in her affidavit, Ms. McRae stated that while she does not remember whether Petitioner kicked the victim, she does recall that "he put his foot in [the victim's] face." (McRae Aff. ¶ 10.) Additionally, in her trial testimony, Ms. McRae testified that Petitioner and the victim "had been drinking" and were both "drunk." (Trial Tr., Vol. V at 898-900.) Her characterization in her affidavit of Petitioner's level of intoxication as "sloppy drunk," therefore, is not altogether inconsistent with her trial testimony. At trial, Petitioner's counsel had the opportunity to cross-examine Ms. McRae, and, in fact, did so. Her post-trial affidavit was not presented until three years after the trial and more than four years after the murder itself. There is no indication in the record as to why the affidavit, coming so late in the process, should be considered more reliable than Ms. McRae's trial testimony. This evidence is simply not of the kind, and not of "extraordinarily high" probative value, required to support a claim of actual innocence,

-13-

whether it be innocence of first-degree murder or innocence of any sentencing factor that made Petitioner eligible for capital punishment. *See Herrera*, 506 U.S. at 417; *Buckner*, 453 F.3d at 200. This claim, accordingly, is without merit.

### CLAIMS II, III and IV - Ineffective Assistance of Counsel ("IAC")

Petitioner asserts that his conviction and sentence are unconstitutional because Petitioner was denied his right to the effective assistance of counsel under the Sixth Amendment. The merits of Petitioner's claim are squarely governed by the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984).

Under the two-part test established in *Strickland*, a defendant first "must show that counsel's performance was deficient." *Id.* at 687. To prove deficiency, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the defendant must show that the deficient performance actually prejudiced him. The defendant bears a "'highly demanding' and 'heavy burden' in establishing actual prejudice." *Williams v. Taylor*, 529 U.S. 362, 394 (2000); *see also Strickland*, 466 U.S. at 694.

To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "Indeed, it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding, because virtually every act

-14-

or omission of counsel would meet that test." *Williams*, 529 U.S. at 394; *see also Strickland*, 466 U.S. at 694. Review of counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689. In addition, competency is measured against what an objectively reasonable attorney would have done under the circumstances. *Id.* at 687-89. Counsel are afforded a strong presumption that their performance was within the broad range of professionally competent assistance. *Id.* at 689.

In the context of a capital sentencing proceeding, a demonstration of prejudice requires a showing that "there is a reasonable probability that, absent the errors [of trial counsel], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. To make such a showing, a petitioner need not establish a reasonable probability that the entire jury would have voted against the death sentence, rather that "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). In determining whether a petitioner has carried his burden of showing that there is a reasonable probability that at least one juror would have declined to impose a death sentence if presented with certain mitigating evidence, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* at 534.

-15-

## CLAIM II - Ineffective Assistance of Counsel in Guilt Phase

The Petitioner's ineffective assistance claim in Claim II is broken into four subparts. This claim was raised in Petitioner's MAR and was denied by the state court without an evidentiary hearing.

## Claim IIa. Failure to Present Evidence of Diminished Capacity

Petitioner contends in Claim IIa that trial counsel were ineffective because they failed to introduce in the guilt phase of the trial the testimony or report of Dr. William M. Tyson, a licensed psychologist who had examined Petitioner. Petitioner claims that Dr. Tyson's testimony at the guilt phase would have been similar to his sentencing phase testimony in which he opined that Petitioner's capacity to weigh his options, to plan, and to consider the consequences of his actions was impaired, therefore directly affecting the element of premeditation and deliberation required for conviction of first-degree murder. Petitioner argues that trial counsel did not talk with Dr. Tyson about using his testimony at the guilt phase of the trial, in part, perhaps, "because Dr. Tyson was scheduled to attend a conference in California, and counsel had considered simply introducing the report without putting on 'live' testimony." (Pet. at 17.)

Petitioner raised this claim in his MAR. The state post-conviction court found that this claim was procedurally barred, and in the alternative, was without merit. Petitioner did not address the procedural bar issue in his Petition. In oral argument before this Court, counsel for Petitioner argued that the procedural bar was wrongfully applied by the state

-16-

MAR court because Dr. Tyson's affidavit was not in the record and therefore appellate counsel could not have raised the issue on direct appeal. Petitioner alternatively argued, at oral argument, that because Petitioner's appellate counsel's office was in the same location as trial counsel's office, it is unlikely that appellate counsel would have raised the issue of ineffective assistance of trial counsel on appeal.

Under North Carolina law, an MAR will be denied if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C. Gen. Stat. § 15A-1419(a)(3). This state statute has been found to be an independent and adequate procedural rule which bars consideration of the merits of a petitioner's claims on federal habeas review. *McCarver v. Lee*, 221 F.3d 583 (4th Cir. 2000). In order to overcome the procedural bar against him in a MAR proceeding, a petitioner must show either good cause and prejudice or that a "fundamental miscarriage of justice" will occur. *See* N.C. Gen. Stat. § 15A-1419(b)(1), (2). In a capital case, a fundamental miscarriage of justice is shown if "defendant establishes by clear and convincing evidence that, but for the error, no reasonable fact finder would have found the defendant eligible for the death penalty." N.C. Gen. Stat. § 15A-1419(e)(2). This standard has been interpreted to mean a substantial showing of innocence of the crime or of the death sentence. *See Schlup v. Delo*, 513 U.S. 298 (1995); *Smith v. Murray*, 477 U.S. 527 (1986). Innocence of the death sentence means that none of the aggravating factors exist, or that the required age or state of mind to be eligible for the death sentence are not present. *See Sawyer*

-17-

*v. Whitley*, 505 U.S. 333 (1992). The United States Supreme Court has held that in order to avoid the application of the procedural bar, Petitioner must show "actual error," i.e., that an error occurred during the trial or sentencing phase that worked to his actual and substantial disadvantage, infecting the entire trial. *United States v. Frady*, 456 U.S. 152 (1982). Moreover, a petitioner cannot establish cause when the facts underlying his claims were in existence and were available upon a reasonably diligent search. *Rose v. Lee*, 252 F.3d 676, 687 (4th Cir. 2001) (citing *Murphy v. Netherland*, 116 F.3d 97 (4th Cir. 1997)).

Under state law, to avoid procedural default a defendant must raise on direct review those ineffective assistance of counsel claims that are apparent on the face of the record. N.C. Gen. Stat. § 15A-1419(a)(3); *State v. Hyatt*, 355 N.C. 642, 668, 566 S.E.2d 61, 78 (2002), *cert. denied*, 537 U.S. 1133 (2003).[2] The state MAR court found that Petitioner was in a position in his direct appeal to raise this issue with regard to trial counsel's alleged ineffective assistance of counsel for failure to present Dr. Tyson's report. The state court

_____

[2] The United States Supreme Court has held that a federal habeas petitioner is not required to raise ineffective assistance of counsel claims on direct appeal in order to preserve his claims for collateral review. *Massaro v. United States*, 538 U.S. 500 (2003). However, as has been noted by the North Carolina Court of Appeals, *Massaro* involved federal collateral proceedings under 28 U.S.C. § 2255 and thus "does not affect the requirement of a defendant to raise ineffective assistance of counsel claims that are apparent from the record to preserve them for state collateral review." *State v. Lawson*, 159 N.C. App. 534, 545, 583 S.E.2d 354, 361 (2003). Thus, under North Carolina law, defendants still must raise those ineffective assistance of counsel claims on direct appeal that are apparent from the record. *State v. Thompson*. 359 N.C. 77, 123, 604 S.E.2d 850, 881 (2004), *cert. denied*, 546 U.S. 830 (2005); *see also Perkins v. Lee*, 72 Fed. Appx. 4, 9 n.1 (4th Cir. 2003)(noting that *Massaro* involved a § 2255 claim and that because the holding in that case was not based upon constitutional mandates, "[i]n habeas proceedings brought under § 2254 to challenge state court convictions, we are constrained to respect the contrary view of the North Carolina Supreme Court.").

-18-

found that the claim was readily apparent from the record and should have necessarily been raised on direct appeal to avoid procedural bar under § 15A-1419(a)(3). In his federal habeas claim, Petitioner has failed to make a *prima facie* demonstration of either (1) good cause for excusing the failure to make the claim, and actual prejudice resulting from this claim; or (2) that failure to consider this claim will result in a fundamental miscarriage of justice. *See* N.C. Gen. Stat. § 15A-1419(b); *see also Wainwright v. Sykes*, 433 U.S. 72 (1977) (holding a petitioner must demonstrate good cause and actual prejudice due to the default before a federal court may disregard the procedural bar).

In an affidavit which is attached to the Petition, Dr. Tyson states that he prepared a report in this case and delivered it, by facsimile, to Petitioner's trial attorneys on January 24, 2000, the first day of the trial. The report is in the record. (MAR, Ex. 3, William M. Tyson Affidavit ("Tyson Aff.").) There was discussion between counsel and the trial judge at the end of the guilt/innocence phase about Dr. Tyson's testimony, and whether he would be available to testify in person. Dr. Tyson ultimately did not testify in the first phase of the trial, but he did testify in the sentencing phase and his written report was introduced into evidence. (Trial. Tr., Vol. III, Def.'s Ex. 2 at 1502, 1552.) It was obviously available to the Petitioner in his direct appeal, since Petitioner's counsel had the report at the time of the trial and, indeed, it was part of the trial record. The court recognizes that trial counsel and first appellate counsel did not have the benefit of Dr. Tyson's affidavit which was not prepared

until January 22, 2003.[3]  However, in his report and in his testimony, which were before the

trial court, Dr. Tyson clearly raised the issue of Petitioner's impaired capacity.  In the report,

Dr. Tyson indicated that Petitioner admitted to alcohol and marijuana consumption at and

around the time of the offense, and he opined that Petitioner's ability to think through his

behavior and to appreciate the connection between his actions and consequent events "would

have been impaired at the time of the offense."  (Tyson Aff., Ex. A at 3.)  Thus, on direct

appeal,  Petitioner could have raised the issue of whether Dr. Tyson's report should have

been offered in the guilt phase of the trial, and whether a diminished capacity instruction

should have been given to the jury, as well as whether trial counsel was ineffective for failing

to present Dr. Tyson's report (or testimony) and failing to request a diminished capacity

instruction.  Petitioner's argument that because Dr. Tyson's affidavit was not in the record,

this issue could not have been raised on direct appeal is without merit.

        Petitioner's argument, asserted at oral argument, that appellate counsel would not have

raised the ineffective assistance of trial counsel on direct appeal because his office was at the

same location as that of trial counsel, is similarly without merit.  There is no evidence in the

record that trial counsel, Ms. Costner, and appellate counsel, Mr. Fischer, were partners such

as to preclude adequate development of the IAC claim on direct appeal.  At best, the record,

---

[3]  In his affidavit, Dr. Tyson opined that Petitioner's "ability to think through his behavior,
to consider the consequences of his actions, to reasonably plan, or to understand and appreciate the
connection between his actions and consequent events was impaired." (Tyson Aff. ¶ 6).  Dr. Tyson
stated that if he had been asked, he "would have testified this way at the guilt phase of the trial." *Id.*
He also stated his belief that "this was not a calculated, premeditated and deliberated killing as I
understand those terms." *Id.* ¶ 8.

which contains addresses for these attorneys, indicates only that they shared office space, or, even less compelling, that they were located in the same office building. There is simply no evidence of a conflict of interest which would have prevented appellate counsel from raising the IAC claim on direct appeal.

Petitioner has failed to show either cause and prejudice for the failure to raise this issue on direct appeal, or that application of the procedural bar rule will result in a fundamental miscarriage of justice in this case. Accordingly, this claim is procedurally barred from habeas review.

Moreover, on the merits, there is no evidence in the record of Petitioner's mental condition suggesting that he was incapable of forming the specific intent to kill the victim. Under North Carolina law, diminished capacity means the inability to form the specific intent to kill. *See State v. Roache*, 358 N.C. 243, 282, 595 S.E.2d 381, 407 (2004); *State v. Shank*, 322 N.C. 243, 250-51, 367 S.E.2d 639, 644 (1988). Dr. Tyson's report merely indicated that Petitioner's capacity was impaired, not that he was incapable of forming the requisite intent to kill the victim. There was no suggestion in the report which would indicate to a

reasonable trial counsel that diminished capacity would be a viable defense.[4]  The failure of trial counsel, therefore, to use Dr. Tyson's testimony or report in the guilt phase of the trial did not amount to deficient performance under *Strickland*.  Rejection of this claim by the state MAR court was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  *See Williams,* 529 U.S. at 412-13.  Petitioner's Claim IIa is without merit.

### Claim IIb.  Failure to Request Voluntary Intoxication Instruction

In this claim, Petitioner alleges that his trial counsel were ineffective because they rejected the trial judge's offer of a jury instruction on voluntary intoxication, despite evidence of Petitioner's drinking and impairment at the time of the shooting.  As in the previous claim, this one was also raised in the state MAR, where the state court found it to be procedurally barred:

> Defendant was in a position to raise this issue during his direct appeal. All of the evidence regarding defendant's intoxication or lack thereof was

---

[4]  Petitioner also attached to his Petition the affidavit of J. Gary Hoover, a licensed psychologist, in support of this claim.  Dr. Hoover reviewed Dr. Tyson's notes and report, together with the affidavit of Lisa McRae and excerpts from testimony at Petitioner's trial, including that of Dr. Tyson.  There is no indication that Dr. Hoover ever examined Petitioner.  In his affidavit, dated January 23, 2003, Dr. Hoover stated that based on the materials he reviewed, he would have testified that Petitioner's "capacity to plan, to weigh options, to consider the consequences of his actions and to understand the criminality of his behavior and to conform his behavior to the requirements of the law was impaired at the time of the shooting." (MAR, Ex. 4, Gary Hoover Affidavit ("Hoover Aff.") ¶ 5.)  This affidavit, coming three years after the trial in this case, is of little value.  Moreover, it is premised on testimony which Dr. Hoover states characterized Petitioner as being "acutely intoxicated." *(Id.*  ¶ 4.)  As discussed in Section IIb, *infra*, this characterization was not supported by the actual witnesses who testified that Petitioner was able to walk and talk normally and was not too drunk to know what he was doing.

-22-

> before the trial court. The testimony of Jesse Harriman, Lisa McRae, Sabrina
> Porter and the defendant was before the Supreme Court, which is the testimony
> that defendant now says supported a voluntary intoxication defense.

(MAR Order at 15.) The MAR court went on to summarily deny this claim on procedural

grounds.

Petitioner did not address the procedural bar issue in his Petition. Thus, as in the prior

claim, Petitioner has not shown cause and prejudice such as would allow this court to

disregard the procedural bar. *See* N.C. Gen. Stat. § 15A-1419(b); *see also Wainwright v.*

*Sykes*, 433 U.S. 72 (1977) (holding a petitioner must demonstrate good cause and actual

prejudice due to the default before a federal court may disregard the procedural bar).

On the merits as a habeas claim, moreover, this claim would also fail. Trial counsel

discussed this issue in a jury charge conference with the trial judge. It appears to this Court

to be an exaggeration to say that the trial judge "offered" to charge voluntary intoxication and

that "[t]rial counsel explicitly rejected the trial judge's offer to instruct the jury on voluntary

intoxication, even though there had been evidence from both prosecution and defense

witnesses about [Petitioner's] drinking during the day and his impairment at the time of the

shooting." (Pet. at 18-19.) In the trial transcript, the discussion of the voluntary intoxication

jury instruction, at best, took only fifteen lines:

> MS. COSTNER: Judge, I think for the purposes of determining what jury
> instruction to give this jury, in that context, I would contend that there's
> nothing about this killing that takes it, you know, into the realm of taking it out
> of a second degree case and making it into a first degree case. The jury may
> or may not find that but, again, I don't know that [] takes it out of the realm of
> considering second degree.

Judge, I think, and I would argue, that there's been evidence of everybody – we're not trying to get a voluntary intoxication. I know the law with regard to that and –

THE COURT: – So you think it ought to be first and second?

MS. COSTNER: I do, Your Honor.

(Trial Tr., Vol. V at 1247.) There is simply no indication that the trial judge "offered" to give a charge on voluntary intoxication or that trial counsel unreasonably rejected such an offer. Indeed, trial counsel demonstrated a knowledge of the law regarding voluntary intoxication and acknowledged that the facts here would not have supported such an instruction under North Carolina law. "Before it is appropriate for the trial court to give a voluntary intoxication instruction, the defendant must produce substantial evidence which would support a conclusion by the trial court that the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated intent to kill." *State v. Laws*. 325 N.C. 81, 98, 381 S.E.2d 609, 619 (1989). There was evidence in the record that Petitioner had consumed an unknown quantity of alcohol over the course of the day and evening on which the murder occurred, but there was no direct evidence as to Petitioner's state of mind. At least three of the State's witnesses testified that although Petitioner had been drinking, he walked and talked normally and appeared to know what he was doing. Lisa McRae testified that Petitioner "was drunk but I don't think he was too drunk to know that he, you know, wanted to shoot him." (Trial Tr., Vol. V at 903.) Defense witness John Luckey testified that he could not recall if

-24-

Petitioner was drinking. (*Id*. at 1140.) Defense witness Jessie Harriman, who had been drinking with Petitioner on the day of the murder, testified that together, over the course of several hours earlier in the day, he and Petitioner drank a 12-pack of beer, but he was uncertain how many beers Petitioner had consumed. (*Id*. at 1143-44.) Petitioner testified that he did not know how much he had had to drink and he did not testify that he was drunk. (*Id*. at 1198.)

The MAR court found that, under the facts as they were developed at trial, there was insufficient evidence to cause the trial court to give an instruction on voluntary intoxication and therefore trial counsel was not ineffective for failing to seek such an instruction. The MAR court further found that Petitioner was not prejudiced by the lack of such a request, since the evidence of Petitioner's drinking was before the jury and the trial court gave an instruction on second-degree murder, which allowed the jury to consider a lack of specific intent on Petitioner's part even though there was not a specific instruction on voluntary intoxication. In light of the uniformly consistent evidence that although Petitioner had been drinking, he did not appear to be or act drunk, and that he was in control of his actions when he shot the victim, this court cannot conclude that the MAR court's determination that Petitioner failed to establish deficient performance and prejudice was unreasonable. This claim is without merit.

**Claim IIc.  Failure to Discover and Present Evidence of Intoxication**

Petitioner also contends that trial counsel were ineffective because they failed to adequately investigate the degree of Petitioner's impairment and to present available evidence to the jury.  Specifically, this argument centers on the affidavits of two individuals, John Luckey and Catina Howell.

One of the investigating officers, C.W. Fine, interviewed John Alonzo Luckey, who had been at the pool area with the victim and his friends on the day in question.  According to the investigative notes, Mr. Luckey told Officer Fine that "there was a young black male at the pool acting 'crazy' by hitting the fence like he was boxing it.  He kept saying that he was bored and needed some 'weed.'" (MAR, Ex. 6, Notes of Officer Fine.)  The young black male told Mr. Luckey that he was "'fucked up on liquor'" and "'needed to do something.'" (*Id*.)  Mr. Luckey did not actually observe the shooting, but he told Officer Fine that  several people told him that the person who shot the victim was the same young black male he had seen acting "crazy" hours earlier.  At trial, Mr. Luckey testified that he could not recall whether Petitioner was drinking that day or not.  (Trial Tr., Vol. V at 1140.)  Petitioner argues that if trial counsel had cross-examined Luckey using the notes from Officer Fine's interview, the testimony would have supported a voluntary intoxication instruction to the jury.

The state MAR court dismissed this claim, finding that there was no inference to be drawn from Mr. Luckey's statement that Petitioner was incapable of forming a specific intent

to kill.  The MAR court went on to state "[e]ven if Mr. Lucky [sic] had testified exactly to the matters he related to Officer Fine, this testimony would not have supported a voluntary intoxication instruction alone or in conjunction with any other evidence."  (MAR Order at 18.)

As discussed with regard to subclaim IIb, to support a voluntary intoxication instruction, there must be evidence that Petitioner was so intoxicated such as to render him "utterly incapable of forming a deliberate and premeditated intent to kill." *Laws*, 325 N.C. at 98, 381 S.E.2d at 619.  Mr. Luckey's statement to Officer Fine would not support such a jury charge.  Not only does the statement not indicate that Petitioner was incapable of forming the specific intent to kill, but it also suggests that Mr. Luckey did not observe Petitioner close enough in time to the murder to be able to reasonably testify regarding Petitioner's level of intoxication when he shot the victim.  Moreover, counsel's decision to not cross-examine Mr. Luckey using his earlier statement was a strategic trial decision to which courts give considerable deference. *See Strickland*, 466 U.S. at 689-90.  Trial counsel were faced with a difficult decision.  Mr. Luckey's statement concerning Petitioner's behavior (i.e., that he needed some "weed") understandably could have troubled the jury and it was reasonable for trial counsel to seek to keep this evidence from being introduced.  More importantly, Petitioner fails to show that he was prejudiced by his counsel's performance, given the weak evidence in the record of serious intoxication and Petitioner's own testimony that he had not been drinking continuously that afternoon.  The MAR court's decision was

neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Williams*, 529 U.S. at 412-13.

Similarly, Petitioner's claim with regard to trial counsel's failure to present the testimony of Catina Howell is without merit. Catina Howell was the girlfriend of Jessie Harriman, with whom Petitioner had been drinking on the day of this incident. A private investigator working for the defense interviewed Ms. Howell, who provided an unsworn handwritten statement. In her statement, Ms. Howell recounted that Petitioner had been drinking beer and smoking marijuana with Mr. Harriman on the day of the shooting. She stated that between them, Petitioner and Harriman drank a twelve pack of beer. (MAR, Ex. 7.) Ms. Howell did not give any statement regarding Petitioner's behavior or level of intoxication, and she was not present when he shot the victim. Mr. Harriman, who did testify, stated that he could not remember how the twelve pack was apportioned between himself and Petitioner and he could not recall how many beers Petitioner had consumed (Trial Tr., Vol V at 1143-44.) Ms. Howell's statement clearly does not show that Petitioner was incapable of forming the requisite specific intent to kill such as would require a jury charge on voluntary intoxication.

With regard to this claim, Petitioner has not met his burden of showing deficient performance on the part of trial counsel. Moreover, even if trial counsel had called Ms. Howell as a witness, her testimony would not have supported a voluntary intoxication instruction, thereby negating any claim of prejudice resulting from the allegedly deficient

-28-

performance. *Strickland,* 466 U.S. at 694. The MAR court's decision was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Williams*, 529 U.S. at 412-13.

<h2 align="center">Claim IId. Failure to Impeach State's Witnesses</h2>

In his last subclaim under Claim II, Petitioner alleges that trial counsel's performance was deficient in that counsel failed to impeach the State's witnesses whose trial testimony differed from their statements to investigators. Specifically, Petitioner points to the testimonies of witnesses Sabrina Porter and Lisa McRae.

In his narrative notes, investigating officer D.J. Goins indicated that Ms. Porter "only heard the shots" and ran to give first aid to the victim. (MAR, Ex. 10.) In a later sworn statement, as well as in her testimony at the *Watson* hearing and at trial, Ms. Porter provided more details, testifying that she saw Petitioner strike the victim after he shot him. Defense counsel did not try to impeach Ms. Porter with her allegedly inconsistent statement in Officer Goins' report. There is no indication, however, that Ms. Porter was ever asked by Officer Goins if she saw Petitioner hit or kick the victim after the shooting. Officer Goins did not take extensive statements from any witnesses; he was one of the initial responders who clearly was trying to quickly obtain as much information as he could, secure the scene, and determine, if possible, the identity of the shooter. Petitioner contends that trial counsel should have cross-examined Ms. Porter about her short statement to Officer Goins or should have called Officer Goins to testify. Even if this Court were to second-guess the trial strategy

-29-

of defense counsel, Petitioner has not met his burden of showing that the outcome of the proceeding would have been different if counsel had questioned Ms. Porter about her statement, especially in light of the corroborating testimony of other witnesses, including Lisa McRae.

Petitioner also contends that trial counsel were ineffective for failing to cross-examine Lisa McRae concerning her prior statement. Ms. McRae was interviewed immediately after the shooting by Officer Heflin. She did not mention seeing Petitioner kick or hit the victim and she told Officer Heflin that she heard the gunshots but did not actually see the shooting. Petitioner argues that trial counsel should have used the earlier statement to attempt to impeach Ms. McRae's trial testimony.

Following the shooting and her initial statement to the investigating officer, Ms. McRae gave a detailed tape-recorded statement to a detective. In this statement, Ms. McRae told the detective that she heard the shots, saw the victim fall and saw Petitioner kicking him. Like Ms. Porter, she also stated that she heard Petitioner say to the victim, "You thought I was playing, you thought I was playing." Again, this Court notes that in her first statement, which was provided at the scene in the initial aftermath of the shooting, Ms. McRae was not asked if she saw Petitioner kick the victim. Her descriptions of the incident in her recorded statement and her testimony at both the *Watson* hearing and at trial are all consistent, and, further, are corroborated by other testimony, in particular by the testimony of Ms. Porter, who also related the "you thought I was playing" taunt by Petitioner. This corroboration

-30-

overbears any minor inconsistencies between Ms. McRae's initial statement and her later detailed statement and testimony.

It must be noted as well that, while trial counsel did not call Officer Heflin to testify at the trial to attempt to impeach Ms. McRae's testimony, counsel did elicit the same information from Ms. McRae on cross-examination:

Q.    You said in your testimony on direct that Cerron, after he shot him, kicked him and stomped on his face?

A.    Yes.

Q.    You gave a statement to the officers and didn't say anything about stomping on his face. Is that something you remembered since you gave that statement?

A.    Yes

Q.    And you gave a statement to Detective Spillman as well and you didn't say anything about it then?

A.    Well, that's what he did.

Q.    Who saw the kicking?

A.    Whatcha you mean? I saw the kicking.

       MR. HALL: Objection, unless she knows.

       THE COURT: Overruled.

Q.    Who else would have been in a position to see the kicking?

A.    I'm not sure, because after Mike had got shot, to me everybody was gone. I didn't see nobody.

Q.    So you were the only one that saw it?

-31-

A.    As far as I know of.

Q.    You gave a statement to Detective Spillman on December 17th, didn't you?

A.    Yes.

Q.    And you told him that you and Jessie were the only ones that saw the kicking?

A.    Jessie came up there later cause he was telling Cerron to run.  He was like go on.

Q.    Is your recollection of the events different now than it was on December 17th?

A.    To tell you the truth half of it I'm not really trying to remember because I'm trying to get it all over with.

Q.    So your recollection may not be as clear now as it was then?

A.    It's clear enough.

(Trial Tr., Vol V at 906-07.)

The MAR court found that Petitioner failed to show deficient performance of trial counsel or prejudice therefrom.  For the reasons stated above, this Court finds that the MAR court's decision on claim IId was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  *Williams*, 529 U.S. at 412-13.

### CLAIM III - Ineffective Assistance of Counsel in Sentencing Phase

In his third habeas claim, Petitioner contends that he received ineffective assistance of counsel during the sentencing phase of his trial because trial counsel did not adequately

-32-

prepare Dr. Tyson for his testimony. Petitioner cites no specific examples of how trial counsel failed to prepare Dr. Tyson, arguing instead that counsel did not present Dr. Tyson's entire *curriculum vitae* to the jury and that counsel did not provide Dr. Tyson with the information from other witnesses "who had told police about Mr. Hooks's 'crazy' behavior and his impairment, [which] would have strengthened the presentation by Dr. Tyson." (Pet. at 26.)

As outlined above, to show that he received ineffective assistance of counsel, Petitioner must show that (1) his attorney's performance "fell below an objective standard of reasonableness" and (2) a reasonable probability exists that, but for the deficient performance, he would not have been sentenced to death. *Strickland v. Washington*, 466 U.S. at 687-88. The MAR court found that Petitioner had satisfied neither prong of the *Strickland* analysis:

> As a result of trial counsel's investigation, preparation and presentation, the trial court submitted fifteen (15) mitigating circumstances for the jury's consideration. Defendant has not alleged or shown in any manner that trial counsel's performance was deficient or that he was prejudiced by counsel's performance in this regard.

(MAR Order at 26-27.)

The record here simply does not support Petitioner's claim that trial counsel failed to properly prepare Dr. Tyson for his testimony. Dr. Tyson's report was submitted to the jury for its consideration. He testified that his report was based on the results of a battery of psychological tests performed on Petitioner. (Trial Tr., Vol. VII at 1501-02.) In both his

-33-

report and his testimony, Dr. Tyson stated that Petitioner had underdeveloped skills for adult functioning as a result of chronic alcohol and substance abuse from a young age. (*Id*. at 1503-04.) He also indicated that Petitioner had told him "and there is corroborating evidence in the record that indicates that [Petitioner] had consumed a sizeable quantity of alcohol" on the day of the murder. (*Id*. at 1505.) Dr. Tyson further testified that Petitioner suffered from substance abuse personality disorders and that Petitioner's capacity to conform his conduct to the requirements of the law was impaired, both by these disorders and by his "immediate intoxication" on the date in question. (*Id*. at 1507.)

Petitioner's argument on this claim is difficult to follow. There is simply no evidentiary support for his allegation that the performance of trial counsel was deficient on this ground. Moreover, even if counsel's performance were deficient, Petitioner has not shown that, but for the alleged constitutionally deficient performance, he would not have been sentenced to death. *Strickland*, 466 U.S. at 694. Trial counsel presented extensive testimony in mitigation at the sentencing phase which detailed Petitioner's background, childhood, and mental disorders. The evidence regarding Petitioner's alcohol intake on the day of the murder was already before the jury. Any additional evidence was merely cumulative. The trial court submitted the (f)(9) catch-all mitigating factor to the jury, allowing them to consider any evidence it viewed to be mitigating. N.C. Gen. Stat. § 15A-2000(f)(9). The MAR court did not err in finding that Petitioner failed to support his allegation that trial counsel provided ineffective assistance at sentencing which prejudiced

-34-

him. This Court finds that the state court applied the appropriate United States Supreme Court law in evaluating the constitutional standard for the admission of evidence gained from a mental competence evaluation in a criminal trial as well as Petitioner's claims of ineffectiveness of counsel. This Court concludes that the state court's adjudication did not result in a decision contrary to or an unreasonable application of clearly established federal law. For the reasons stated above, Petitioner's Claim III is without merit.

### CLAIM IV - Failure to Present Diminished Capacity Defense

In his fourth habeas claim, Petitioner claims that his trial counsel failed to advise him of a possible defense of diminished capacity and failed to get his approval before deciding not to present this defense at the guilt phase of his trial. Petitioner contends Dr. Tyson's report (or testimony), which was not introduced at the guilt phase of Petitioner's trial, would have entitled Petitioner "to an instruction on second degree murder on the theory of diminished capacity." (Pet. at 29.) According to Petitioner, trial counsel did not explain the importance of Dr. Tyson's findings and did not receive permission from Petitioner to forego presenting this evidence to the jury.

Dr. Tyson was retained by trial counsel to conduct a psychological evaluation of Petitioner. In fulfilling this task, Dr. Tyson interviewed Petitioner, examined his medical and family history, performed a battery of psychological tests, reviewed investigative material regarding the allegations and prepared a written report.

-35-

In his report, which was provided to trial counsel, Dr. Tyson gave his diagnostic impressions:

> These data reveal a psychologically intact twenty-one year old with primitively developed skills for emotional expression and social connection. Skills for problem solving, decision making, conflict resolution, and impulse control are similarly limited. Already precarious development of adult functioning appears to have been further compromised by early onset of chronic substance dependence. He appears to have made a marginal psychosocial adjustment and has established a lifestyle at the peripheries of society. He lacks insight into his actions and motivations and appears to harbor unrealistic self-perceptions. He avoids or lacks the skills for introspection and honest self-appraisal that might lead to accurate self-assessment.

> It appears that impoverished skills for adult functioning combined with early onset of substance dependence may have compromised higher functioning such that the ability to think through his behavior, to consider the consequences of his actions, to reasonably plan, or to understand and appreciate the connection between his actions and consequent events would have been impaired at the time of the offense. These data support the likelihood that he would have been acting on impulse with a limited ability to reason.

> These data yield no basis on which to question his capacity to proceed to trial or his competence at the time of the crime. He is able to understand the charges against him and his position in regards to the proceedings. He is able reasonably to cooperate with his attorney in preparing his defense. These data do not suggest a basis to question his ability to appreciate the wrongfulness of his actions or to differentiate right from wrong at the time of the offense.

(MAR, Ex. A attached to Tyson Aff. at 2-3.)

Under North Carolina law, a defendant may assert diminished mental capacity as a defense to a charge of premeditated and deliberate murder where there is evidence that a mental condition impedes the defendant's ability to form a specific intent to kill. *See State*

-36-

*v. Roache*, 358 N.C. 243, 282, 595 S.E.2d 381, 407 (2004); *State v. Shank*, 322 N.C. 243, 250-51, 367 S.E.2d 639, 644 (1988).

Dr. Tyson's report clearly did not establish the legal standard for diminished capacity in this case. Nowhere in the report does he indicate that Petitioner did not have the "'ability to form the specific intent to kill required for a first-degree murder conviction.'" *State v. Poindexter*, 359 N.C. 287, 291, 608 S.E.2d 761, 764 (2005)(citations omitted). Dr. Tyson's report indicates that Petitioner was psychologically intact and could differentiate between right and wrong.

With regard to the ineffective assistance of counsel claim on this issue, the MAR court found that:

> [I]t was trial counsel's fully informed and reasonable decision not to call Dr. Tyson at the guilt phase. His testimony would not have required the trial court to instruct on diminished mental capacity and was not prejudicial in any event because the trial court did instruct on second degree murder. The jury could have found defendant guilty of second degree murder if they had a reasonable doubt as to whether or not defendant had a specific intent to kill.

(MAR Order at 30.)

This Court finds that counsel's decision to not introduce Dr. Tyson's report at the guilt phase to show diminished capacity was a reasonable decision under the circumstances. Petitioner has failed to meet his burden of showing that his trial counsel were constitutionally ineffective during the guilt phase of the trial. Accordingly, this Court finds that the state MAR court's determination regarding this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme

Court.  *See Bell v. Evatt*, 72 F.3d 421, 429-30 (4th Cir. 1995) (to succeed on an ineffective assistance of counsel claim, defendant must overcome the presumption that a challenged action may be considered appropriate and necessary trial strategy under the circumstances (citing *Strickland*, 466 U.S. at 689)).

## CLAIM V - Short Form Indictment

In his fifth habeas corpus claim, Petitioner argues that the indictment against him failed to charge (1) the elements of first-degree murder and (2) the aggravating circumstances relied upon by the State, in violation of his constitutional rights.  This claim was found to be without merit by the state MAR court.[5]

Petitioner first challenges the constitutionality of the indictment in this case because it did not allege all of the elements of first-degree murder as required under federal constitutional law.  Under North Carolina statutory law, an indictment for murder is sufficient if it alleges "that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder" the victim.  *State v. Hunt*, 357 N.C. 257, 268-69, 582 S.E.2d 593, 601 (2003); N.C. Gen. Stat. §15-144.  Indictments using this language are known as "short form" indictments.  The State of North Carolina indicted Petitioner using a "short form" murder indictment, which simply charged that he "intentionally, unlawfully, willfully

---

[5]  The MAR court also found that this claim was barred on procedural grounds because Petitioner did not raise it on direct appeal though he was in a position to do so. (MAR Order at 37-38.)  The State does not address procedural bar as it relates to this claim.  This Court will, accordingly, address the merits of the claim though it agrees with the state court that the claim would be procedurally barred.

-38-

and feloniously and with malice aforethought did kill and murder Michael Miller . . . ." (MAR, Ex. 12.)  The indictment, on its face, cited the North Carolina murder statute, N.C. Gen. Stat. § 14-17.

While N.C. Gen. Stat. § 15-144 sets out the language necessary to charge the crime of "murder" in an indictment, North Carolina statutory law actually recognizes two forms or categories of murder, i.e., first-degree and second-degree murder, and the sentencing scheme differs with each one.  *Hartman v. Lee*, 283 F.3d 190 (4th Cir. 2002); N.C. Gen. Stat. § 14-17.  First-degree murder includes, among other things, murders committed with deliberation and premeditation, and murders committed in connection with the commission of certain serious felonies.  All murders which are not first-degree murders are second-degree murders.  *Id*. §14-17.  Persons convicted of first-degree murder receive a sentence of either death or life imprisonment without parole, while individuals convicted of second-degree murder are sentenced to lengthy terms of imprisonment.  *Id*.

Petitioner's claim here is not that he was not put on notice that he was charged with murder, but rather that the indictment did not include the specific elements of deliberation and premeditation necessary to charge him specifically with first-degree, as opposed to second-degree, murder.  It must be noted, however, that Petitioner does not contend that he did not have actual notice that he was charged with first-degree murder, nor does he argue that all of the essential elements of first-degree murder were not actually presented to and

-39-

found by the jury to exist beyond a reasonable doubt. Instead, Petitioner is arguing that the indictment was procedurally deficient under the United States Constitution.

Petitioner relies on *Jones v. United States*, 526 U.S. 227 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in support of his contention that all of the elements of the offense of first-degree murder must be included in the indictment. *Jones* involved a federal prosecution and generally stands for the proposition that in construing a federal criminal statute, a court must keep in mind that:

> [U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Jones*, 526 U.S. at 243 n.6. Consequently, certain "sentencing factors" may actually be deemed elements of the crime and persons charged in federal court have a right to have these elements charged in an indictment and submitted to a jury using a "beyond a reasonable doubt" standard of proof. *Id*.

*Apprendi*, the second case relied upon by Petitioner, involved a state prosecution rather than a federal one. The Supreme Court held that in state prosecutions, just as in federal prosecutions, there is a constitutional requirement that all elements be presented to a jury and proved beyond a reasonable doubt. However, *Apprendi* does not contain language requiring that all elements of a crime be alleged in indictments in state prosecutions. Petitioner argues, with little analysis, that the constitutional protections of *Jones* extend to state prosecutions through *Apprendi*.

-40-

Both *Jones* and *Apprendi* were decided prior to the date Petitioner's conviction become final. Thus, the State's reliance on *Hartman v. Lee*, 283 F.3d 190 (4th Cir. 2002) is misplaced to some degree. In *Hartman*, the court of appeals, after engaging in a discussion of Sixth Amendment law in the context of the requirements of indictments and a discussion of *Jones* and *Apprendi*, found that *Jones* and *Apprendi* did not apply retroactively on habeas review and that the Fifth Amendment indictment requirement had not been extended to state prosecutions which were final prior to the dates of those decisions. Thus, the court found that the Sixth Amendment, neither by itself nor as incorporated by the Fourteenth Amendment, invalidated North Carolina's "short form" indictments. However, because *Jones* and *Apprendi* did not retroactively apply to the petitioner in *Hartman,* the Fourth Circuit specifically noted that it was not addressing the impact of those decisions to the case it was deciding. *Id*. at 195 n.4. As noted above, there is no question of retroactive application of *Jones and Apprendi* in this case.

This precise question dealing with the interaction of *Jones* and *Apprendi* has recently been addressed by this court in *Holliman v. Beck*, 351 F. Supp. 2d 449 (M.D.N.C. 2005). In an extensive analysis, the court found that *Apprendi* did not extend the "indictment requirement" to state court prosecutions. The court noted that this outcome was supported by two later cases, *United States v. Cotton*, 535 U.S. 625, 627 (2002) and *Harris v. United States*, 536 U.S. 545, 549 (2002), in which the Supreme Court noted the distinctions between the requirements for federal and state court prosecutions:

-41-

> In *Cotton*, the Supreme Court cited *Apprendi* for the proposition that facts which increase the maximum penalty for a crime must be submitted to a jury and proved beyond a reasonable doubt. It then stated that, in federal prosecutions, *Jones* imposes the additional requirement that those facts be charged in an indictment. Similarly, in *Harris*, the Supreme Court noted that in federal prosecutions, persons charged with a crime have a right to the presentment of an indictment to a Grand Jury, while persons in all criminal prosecutions have a right to a trial by jury and right to have the government prove each element of a crime beyond a reasonable doubt.

*Holliman*, 351 F. Supp. 2d at 454. Clearly, as noted by District Judge James A. Beaty, Jr. and Magistrate Judge Russell A. Eliason in *Holliman,* the Supreme Court continues to make a distinction, post-*Apprendi*, between federal and state prosecutions. Thus, as in *Holliman*, this Court cannot say that the state court acted contrary to or engaged in an unreasonable application of *Jones* and *Apprendi* when it determined, based on numerous North Carolina Supreme Court cases, that North Carolina's short form indictments are not unconstitutional under the rules set out in those cases. *See, e.g., State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593 (2003); *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000); *State v. Smith*, 352 N.C. 531, 532 S.E.2d 773 (2000); *State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326 (2000); *see also Stroud v. Polk*, 466 F.3d 291, 296 (4th Cir. 2006) (holding that North Carolina's short form indictment passes constitutional muster as long as it notifies defendant in a murder case that he needs to defend against a charge of first-degree murder), *cert. denied*, ___ U.S. ___, 127 S. Ct. 2978 (2007); *Allen v. Lee*, 366 F.3d 319, 324 (4th Cir. 2004) (holding that a short form indictment alleging elements of common law murder is sufficient to inform defendant of the charge against him).

-42-

Petitioner further argues that the indictment charging him with murder was defective because it did not give notice of and charge the aggravating factor upon which the state relied to authorize the imposition of the death penalty. Under the *Jones/Apprendi* approach, courts have found that in federal prosecutions, aggravating factors necessary to the imposition of the federal death penalty must be alleged in the indictment. *See United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003).[6] However, as noted in *Apprendi*, the Fourteenth Amendment has never been construed to incorporate against the states "the Fifth Amendment right to 'presentment or indictment by a Grand Jury.'" *Apprendi*, 530 U.S. at 477 n.3 (citation omitted). *See also Jackson*, 327 F.3d at 284 ("The Supreme Court did not, however, address the scope of the Fifth Amendment Indictment Clause in *Ring* because that case came from a State system and the Fifth Amendment Indictment Clause has not been incorporated against the States.").

Absent a definitive and controlling pronouncement on this issue by the United States Supreme Court, this Court must apply existing North Carolina law to this claim. *See Terrell v. State*, 276 Ga. 34, 41-42, 572 S.E.2d 595, 602 (2002) (*Apprendi* and *Ring* did not render unconstitutional Georgia procedure that provided notice of aggravating factors through other means, such as written notice); *State v. Tisius*, 92 S.W.3d 751, 766-67 (Mo. 2002) (*Apprendi* did not require inclusion of aggravating circumstances in indictment because death was the

---

[6] In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that the Arizona sentencing scheme which allowed a sentencing judge, sitting without a jury, to find an aggravating factor in order to impose the death penalty violated the Sixth Amendment. *Ring* clearly, however, did not apply the Fifth Amendment Indictment Clause to state prosecutions.

maximum penalty for murder in Missouri); *State v. Berry*, 141 S.W.3d 549, 562 (Tenn.2004) (post-*Apprendi/Ring*, "[s]o long as adequate notice and opportunity for hearing is provided for by our statutory scheme, aggravating circumstances need not be included in the indictment."); *cf. United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), *vacated on other grounds, Barnette v. United States*, 546 U.S. 803 (2005)(in a federal death penalty case, indictment must allege statutory aggravating factors).[7]

Courts in North Carolina have consistently held that an indictment in a capital case need not identify the aggravating circumstances on which the State intends to rely. *See State v. Braxton*, 352 N.C. 158, 173-74, 531 S.E.2d 428, 437 (2000); *State v. Smith*, 352 N.C. 531, 532 S.E.2d 773 (2000) (both holding that because the crime of first-degree murder and the accompanying maximum penalty of death, as set forth in § 14-17 and North Carolina's capital sentencing statute, are encompassed within the language of the short form indictment, no separate allegations are required to be charged in the indictment where the defendant is sentenced to the statutory maximum punishment for the crime). Likewise, in the instant case, Petitioner was charged with murder, for which the maximum sentence under North Carolina law is death. Thus, no additional facts needed to be charged in the indictment and the

_____

[7] The court in *Barnette* further employed a harmless error analysis to the indictment claim, finding that because the government had served the defendant with a formal notice of intent to seek the death penalty pursuant to the statute, he "cannot claim, even in the slightest, that the government ambushed his defense by attempting to prove previously unknown statutory aggravating factors at the sentencing hearing." 390 F.3d at 786. Similarly, in this case, following a pretrial hearing requested by Petitioner, pursuant to *State v. Watson*, 310 N.C. 384, 387-88, 312 S.E.2d 448, 452 (1984), the trial court found that there was sufficient evidence of the "especially heinous, atrocious or cruel"aggravating factor to entitle the State to proceed in the matter as a capital murder case. (Order dated Jan. 14, 2000.)

defendant had notice that the maximum penalty to which he could be subjected was death. *State v. Holman*, 353 N.C. 174, 540 S.E.2d 18 (2000).

This claim was adjudicated on the merits by the state MAR court. That court's decision was not contrary to or an unreasonable application of United States Supreme Court precedent. This Court finds that the indictment was not defective and the state trial court did not lack jurisdiction to convict or sentence Petitioner. Therefore, Petitioner has failed to carry his burden under 28 U.S.C. § 2254(d) and this Court thereby finds Petitioner's Claim V to be without merit.

## CLAIM VI - Aggravating Factor

In his sixth habeas claim, Petitioner contends that the submission of the "heinous, atrocious or cruel" aggravating factor to the jury was reversible error. Petitioner argues that the evidence showed that he spontaneously shot the victim during an argument after he had been drinking, that the victim did not beg for his life or lay helpless, unable to prevent his impending death, and that Petitioner's conduct did not evidence a depravity of mind beyond that usually found in a first-degree murder case. The North Carolina Supreme Court reviewed the merits of this claim raised by Petitioner on his direct appeal and concluded that:

> Based on the evidence in the instant case, a jury could reasonably infer that the victim was aware of impending death but was helpless to prevent it. Furthermore, defendant's behavior, namely, his decision to kick, pistol-whip, and taunt his felled and dying victim, shows an unusual depravity of mind and a physically agonizing and unnecessarily tortuous death that was not present in the cases cited by defendant.

*Hooks*, 353 N.C. at 639, 548 S.E.2d at 508.

Petitioner does not cite any case in support of his argument that submission of the "especially heinous, atrocious or cruel" aggravating factor was not supported by the evidence in this case. This insufficiency of the evidence argument by Petitioner is without merit. Under North Carolina law, whether the submission of the (e)(9) aggravating factor to the jury was proper or not depends upon the particular facts and circumstances of the case. *State v. Holman*, 353 N.C. 174, 181, 540 S.E.2d 18, 23 (2000). As recounted by the North Carolina Supreme Court, the evidence in this case permits the inference that the killing was physically agonizing to the victim. One witness, Roger Bolden, testified that the victim was conscious, in extreme pain and attempting to talk for at least fifteen minutes after having been shot in the face. (Trial Tr., Vol. IV at 786-90.) There was further testimony from more than one witness that Petitioner kicked and taunted the victim after he shot him. In fact, two witnesses testified that Petitioner, as he was kicking the victim, said, several times, "You thought I was playing, didn't you?" (*Id*. at 817; Trial Tr., Vol. V at 963.) This evidence showed a complete lack of conscience and pity on the part of Petitioner. A reasonable juror could infer that the victim was aware of but helpless to prevent his impending death during the fifteen minutes after he was shot and before he lost consciousness. Moreover, the North Carolina Supreme Court reasonably found, under the circumstances of this case, that the killing "demonstrate[d] an unusual depravity of mind on the part of [Petitioner] beyond that normally present in first-degree murder." *Hooks*, 353 N.C. at 637, 548 S.E.2d at 507.

The Court concludes that the state court's adjudication did not result in a decision contrary to or an unreasonable application of clearly established federal law. For the reasons stated above, Petitioner is not entitled to habeas corpus relief on Claim VI.

## CLAIM VII - Reasonable Doubt Instruction

In his seventh habeas corpus claim, Petitioner contends that the trial judge's instruction on reasonable doubt improperly lowered the prosecution's burden of proof. Petitioner claims that the trial judge deviated from the approved pattern instructions and gave his own definition of reasonable doubt.

The trial judge instructed the jury as to reasonable doubt:

> Now, a reasonable doubt, members of the jury, means exactly what it says. It's not a mere possible, it's not an academic and it's not a forced doubt. There are few things in human experience which are beyond all doubt or which are beyond a shadow of a doubt, nor is it a doubt suggested by the ingenuity of counsel for either side or even by your own ingenuity of mind, not legitimate or warranted by the evidence and the testimony you've heard in this case. Of course, your reason and your common sense would tell you that a doubt wouldn't be reasonable if it was founded upon or suggested by any of these types of considerations.

> A reasonable doubt is a doubt based on reason and common sense arising out of all or some of the evidence – excuse me, out of some or all of the evidence that has been presented or the lack of or insufficiency of the evidence as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

(Trial Tr., Vol. VI at 1321-22.) Petitioner argues that because "[c]losing arguments in criminal cases are a time for counsel to suggest deficiencies in the state's case," the trial judge's instruction to the jury that a reasonable doubt was not a doubt suggested by argument

-47-

of counsel "effectively lowered the prosecution's burden of proof, in violation of *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1991)." (Pet. at 37.)

At trial, Petitioner, despite having several opportunities, did not object to the trial court's jury instructions. Because the issue was not preserved for review, on direct appeal the North Carolina Supreme Court reviewed the record to determine whether the instruction as given constituted plain error. Under this analysis, a defendant is entitled to a new trial only if the error was so fundamental that, without the error, the jury probably would have reached a different result. In rejecting Petitioner's claim on this issue, the North Carolina Supreme Court held that there was no reasonable likelihood that the jury would have applied the instruction in an unconstitutional manner. *Hooks*, 353 N.C. at 635, 548 S.E.2d at 506 (citing *Victor v. Nebraska*, 511 U.S. 1, 6 (1996)).

This Court's review of the trial court's instructions to the jury respecting reasonable doubt, as a whole, does not reveal an impermissible lessening of the prosecution's burden. Petitioner contends the trial court, by defining reasonable doubt, to include the phrase "nor is it a doubt suggested by the ingenuity of counsel" impermissibly suggested to the jury that it could ignore the closing arguments of defense counsel. The North Carolina Supreme Court has on prior occasions found such language to be not erroneous. *See State v. Bishop*, 346 N.C. 365, 399-400, 488 S.E.2d 769, 787-88 (1997) (holding that instruction using nearly identical language "taken as a whole, correctly conveyed the concept of reasonable doubt to the jury"). Moreover, the language in the instruction after the phrase objected to by

-48-

Petitioner suggests to the jury that a doubt suggested by the ingenuity of counsel (for either side) or even by the juror's own ingenuity of mind, that is "not legitimate or warranted by the evidence and the testimony you have heard in this case" would not be a reasonable doubt. The sentence was read as a whole to the jury, and viewed in its entirety, it would be an unreasonable reading of the instruction to find that the jury would hear only the phrase "nor is it a doubt suggested by the ingenuity of counsel" and therefore impermissibly hold the prosecution to a lesser burden of proof. Accordingly, this Court concludes that the state court's adjudication did not result in a decision contrary to or an unreasonable application of clearly established federal law. For the reasons stated above, Petitioner's Claim VII is without merit.

## CLAIM VIII - Submission of (f)(2) Mitigating Circumstance

Petitioner contends in his eighth claim that the trial court violated his Eighth and Fourteenth Amendment rights by refusing to submit a statutory mitigating circumstance to the jury. *See Lockett v. Ohio*, 438 U.S. 586 (1978). The mitigating circumstance at issue is that Petitioner committed the murder while under the influence of a mental or emotional disturbance. N.C. Gen. Stat. § 15A-2000(f)(2). Petitioner contends that the jury was not allowed to consider that he had been smoking marijuana and drinking alcohol prior to the crime, and suffered from a substance induced personality disorder. The State argues that the trial court properly charged the jury on the (f)(6) and (f)(9) mitigating circumstances, consistent with *Lockett*.

-49-

The Supreme Court of North Carolina considered this claim on direct appeal. The court held that the trial court did not err in refusing to submit to the jury this mitigating circumstance because Petitioner had not submitted sufficient evidence to support his contention that he was under a mental or emotional disturbance at the time of the murder. *See Hooks*, 353 N.C. at 641-42, 548 S.E.2d at 509-10. The Court held that the evidence "showed diminished capacity rather than any mental disturbance at the time of the killing." *Id*.

The Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *See Lockett*, 438 at 604. In Petitioner's case, the jury was not prevented from considering any of the evidence Petitioner relies upon in this claim. The jury simply was not given an instruction on the specific mitigating circumstance that Petitioner desired. However, the jury was instructed to consider several similar mitigating circumstances. One such submitted circumstance was whether Petitioner's capacity to conform his conduct to the requirements of the law was impaired. § 15A-2000(f)(6). Petitioner argued in connection with this circumstance that his alcohol use affected his judgment as supported by the testimony of Dr. Tyson. (Trial Tr., Vol. VIII at 1625-26; 1630-31.) In addition, the court submitted a "catch-all" circumstance to the jury. § 15A-2000(f)(9). This mitigating circumstance allowed the jury to consider "any other circumstance arising from the evidence which you [the jury] deem to have mitigating value." (Trial. Tr., Vol. VIII at 1644.)

Because the jury was free to consider as a mitigating factor all of the evidence raised by Petitioner, this Court finds no violation of Petitioner's Eighth or Fourteenth Amendment rights. This Court cannot find that the Supreme Court of North Carolina's decision was contrary to federal law or involved an unreasonable application of federal law. Petitioner's eighth ground for relief should be dismissed. *See* 28 U.S.C. § 2254(d).

### CLAIM IX - Victim Impact Evidence

In his ninth habeas claim, Petitioner argues that the trial court erred by permitting the State to offer victim impact evidence that exceeded the scope of permissible prosecution evidence under *Payne v. Tennessee*, 501 U.S. 808 (1991). Victim impact evidence "is designed to show instead each victim's 'uniqueness as an individual human being.'" *Id*. at 823. Such evidence relating to the victim's personal characteristics is permissible under *Payne* unless the evidence is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id*. at 825.

During the penalty phase, the State presented victim impact testimony from three individuals: the victim's older brother, his father, and his employer. Petitioner complains that the testimony of the victim's brother, in particular, impermissibly focused on the victim's religious practices and the fact that he was a Christian. Petitioner argues that this testimony left "the impression that one who kills a Christian is more deserving of the death penalty than one who kills a non-believer." (Pet. at 40-41.) Put simply, this argument is without merit. The testimony of the victim's family and friends did not amount to lengthy narratives, nor

was it unduly prejudicial. The victim's Christian faith was not a major focus of his brother's testimony; indeed, it was merely a brief reference in the overall picture of the victim as a unique and "individual human being." Certainly, such testimony did not unduly inflame the passions of the jury and convince the jury to sentence Petitioner to death because his victim was a Christian. The North Carolina Supreme Court did not rule unreasonably in concluding that the victim-impact evidence in this case "did not go beyond the bounds of proper victim-impact evidence." *Hooks*, 353 N.C. at 643, 548 S.E.2d at 511, citing *State v. Bowman*, 349 N.C. 459, 478, 509 S.E.2d 428, 439-40 (1998). The single reference to the victim's faith was not so unduly prejudicial so as to violate the Due Process Clause. *Payne*, 501 U.S. at 825. Petitioner's claim for relief on this ground is without merit.

### CLAIM X - Constitutionality of "Heinous" Aggravating Factor

In his tenth habeas corpus claim, Petitioner contends that the trial court erred in submitting the heinous, atrocious, or cruel aggravating factor to the jury as this factor is unconstitutionally vague and overbroad. In ruling on the merits of Petitioner's claim, the North Carolina Supreme Court found "no compelling reason to depart from [its] prior holdings" on this issue. *Hooks*, 353 N.C. at 643, 548 S.E.2d at 511.

Petitioner's sole argument with regard to this claim on habeas is that the state court decision "effectively holds that this aggravating circumstance is present in nearly every killing where the victim has any awareness of what is happening." (Pet. at 41.) The Fourth Circuit has consistently rejected constitutional challenges to North Carolina's "heinous"

instruction. *See Fullwood v. Lee*, 290 F.3d 663, 694 (4th Cir. 2002); *Frye v. Lee*, 235 F.3d 897, 908 (4th Cir. 2000); *Fisher v. Lee*, 215 F.3d 438, 457-59 (4th Cir. 2000) (providing more complete discussion). Petitioner nevertheless contends that the Fourth Circuit position is inconsistent with relevant Supreme Court decisions. The decision of the Fourth Circuit in *Fisher* contains a thorough discussion of the Supreme Court law on this issue, and reasonably distinguishes North Carolina's sentencing instructions from those found unconstitutional in other states. *See id.* This Court agrees that the North Carolina's sentencing instructions, identically applied in this case and *Fisher* and *Fullword* (*compare* Trial Tr., Vol. VIII at 1641-42 *with* 215 F.3d at 458 and 290 F.3d at 694), provide sufficient guidance to the jury on the "heinous" aggravating factor. Therefore, Petitioner's claim must be rejected.

## CLAIM XI - Proportionality Review

Petitioner's eleventh habeas corpus claim is that the death sentence imposed against him was disproportionate as a matter of law and should be set aside. In his claim, Petitioner asserts that the death sentence imposed against Petitioner was disproportionate as a matter of law "since juries do not consistently impose death sentences in cases in which the defendant acted with minimal premeditation and where the fatal shooting occurred in the context of an alcohol-inflamed argument." (Pet. at 42.) In the state court, Petitioner argued that the Supreme Court of North Carolina abused its discretion by failing to vacate the sentence after a proportionality review. Since the Eighth Amendment does not require

-53-

proportionality review of a death sentence, this claim is not cognizable in a federal habeas corpus proceeding. *See Pulley v. Harris*, 465 U.S. 37, 44 (1984) (holding the Eighth Amendment does not require a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases even if requested to do so by the prisoner); *Buchanan v. Angelone*, 103 F.3d 344, 351 (4th Cir. 1996) (the federal Constitution does not require proportionality review).

As the United States Supreme Court noted in *Pulley*, proportionality review may be statutorily defined, but it is not constitutionally mandated by the Eighth Amendment. 465 U.S. at 50-51; *see also Jurek v. Texas*, 428 U.S. 262 (1976) (upholding a death sentence even though neither the statute nor state case law provided for comparative proportionality review). Therefore, in accordance with N.C. Gen. Stat. § 15A-2000(d)(2), the North Carolina Supreme Court during its direct review compared Petitioner's case "to those cases in which [the Supreme] Court has determined the sentence of death to be disproportionate." *Hooks*, 353 N.C. at 644, 548 S.E.2d at 511. The Court specifically compared the instant case to the two cases involving the especially heinous, atrocious or cruel aggravating circumstance in which the Court found the death sentence to be disproportionate and found that those two cases were distinguishable based on the facts. *Id*. at 645, 548 S.E.2d at 512. The court also compared Petitioner's case with "cases in which [the Supreme] Court has found the death penalty proportionate." *Id*. The court concluded that "the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in

-54-

which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment." *Id.* at 646, 548 S.E.2d at 513.

This Court cannot find that the state court's determination was contrary to or involved an unreasonable application of clearly established federal law. There is no merit to Petitioner's Claim XI.

## CONCLUSION

For reasons set forth above, **IT IS RECOMMENDED** that the habeas corpus petition of Cerron Thomas Hooks be denied and dismissed.

_____/s/ P. Trevor Sharp_____
United States Magistrate Judge

Date: September 11, 2007